Filed 4/24/20

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| In re G.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E072514 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J279908 & J279909 & J279910) |
| v. | OPINION |
| K.C. et al., | |
| Defendant and Appellant. | |


APPEAL from the Superior Court of San Bernardino County. Annemarie G. Pace, Judge. Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant K.C.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant A.C.

1

Michelle D. Blakemore, County Counsel, Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

Defendants and appellants A.C. (Father) and K.C. (Mother) are the parents of Gi.C. (a girl born January 2009; hereinafter G.I.), J.C. (a boy born December 2009), and Ga.C. (a boy born February 2018; hereinafter G.A.). Father, with Mother joining, appeals the juvenile court's dispositional order removing G.I., J.C., and G.A. (collectively, the children) from Father's and Mother's (collectively, Parents) custody. For the reasons set forth below, we affirm the court's findings and orders.

## FACTUAL AND PROCEDURAL HISTORY

A.    <u>DETENTION</u>

On February 25, 2019, plaintiff and respondent San Bernardino County Children and Family Services (CFS) received an immediate response referral alleging general neglect of the children by Mother. It was reported that the home was filthy, the floors were covered in feces and urine, a majority of the food in the refrigerator was expired, the food in the cabinets had mold, and the home smelled of marijuana. Mother also did not have any formula for G.A.

When social worker Imani Austin arrived at the home, Mother had already been taken into custody, and she was having suicidal disclosures. Law enforcement was at the home with the children because Father was deployed and no one was available to care for the children. The investigator informed Austin that he observed a bowl that appeared to have drug paraphernalia in it. Rolled-up marijuana cigars were in G.I.'s room. G.A. was taken to the hospital for an overall assessment of his heath due to the condition of the

2

home, possible exposure to drug paraphernalia and the lack of formula. When he was assessed, he was cleared for discharge with no concerns reported.

Austin spoke with Father. Father was deployed in Syria and was trying to return home after being advised of the situation. Father reported knowing that Mother was stressed the past few weeks. He also disclosed that she had a history of mental illness; she was diagnosed with anxiety in 2014. Father believed that Mother had failed to take her medication in the past month because a neighbor had stolen it and they could not afford to replace it. Father also stated that Mother had told him that she refilled the medication about two weeks prior. Father further indicated that to his knowledge, Mother last used marijuana in 2016 at a friend's house. He claimed that he did not know about the condition of the home. The children did not disclose any concerns to him.

G.I. told Austin that she helped with chores, cooking and babysitting G.A. G.I. and J.C. both attempt to clean up the animal feces. G.I. recalled Mother taking "sleeping pills." She denied observing substance abuse, domestic violence, or physical or sexual abuse in the home.

J.D. reported that the home is normally clean. The feces on the floor was from their dogs and he said that it was his responsibility to take care of one of the dogs. He was unsure whether Mother took any medication. He also denied any abuse or domestic violence in the home.

The children were transported to CFS and placed together in a foster home. Social worker Austin interviewed Mother at the jail the next day, and Mother reported being diagnosed with ADHD, anxiety, and depression. Her insurance would not cover

3

replacement of her medication, so she had to wait three months to refill since she could not afford to replace them. She had not informed Father about the change in her mental health diagnosis because she did not want to concern him while he was deployed. She denied having a history of substance abuse, but she admitted using marijuana; she recently used it on February 21, 2019. Mother had a difficult time acknowledging the severity of the living conditions at the home.

On February 26, 2019, CFS filed Welfare and Institutions Code[1] section 300 petitions on behalf of the children under subdivisions (b)(1) and (g). The petitions alleged that (1) Mother failed to provide adequate care and shelter for the children because the home was found to be filthy and hazardous due to dirty clothing, trash, feces, and lack of provisions, which placed the children at substantial risk of serious physical harm; (2) Mother had an untreated substance abuse issue, which prevented her from being able to parent the children adequately; (3) Mother had been diagnosed with ADHD, anxiety, and depression, but had not taken her medication since it was stolen, and Mother had mental health issues, which, if left untreated, placed the children at risk of serious physical harm; (4) Father failed to protect the children from Mother's behavior, and he knew or should have known the dangers to which they were exposed while under Mother's care; and (5) Father was deployed in Syria and unable to make appropriate arrangements for the children.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

4

At the February 27, 2019, detention hearing, the juvenile court found a prima facie case for detaining the children.

B.      JURISDICTON / DISPOSITION

On March 6, 2019, social worker Reese interviewed Parents in their home.

Mother stated that the home "got out of hand" and said it had never happened before. She understood how the home could be an unsafe environment for the children. As to the substance abuse allegations, she claimed she was "shocked and surprised" and had not been using marijuana "not even for a month." Mother said that she would be wiling to take an on-demand drug test. She, however, also admitted that "There may be weed in my system." With regards to Mother's mental health history, she said that she was off her medications for two and a half months. She was now back on her medications and felt better.

Father stated that it was "100% not true" that he failed to protect the children or should have known what they were exposed to at the home because Mother's mental health was "okay" and she had no issues with her mental health in the past.

The social workers also assessed the home. They found the home to meet community standards. It was clean, stocked with food, had new furniture, and the pets were no longer at the home. Parents stated that the paternal grandmother, who resided in New York, came to the home immediately and cleaned the home once she became aware of the concerns for the children.

Mother revealed that the family had a prior child welfare history in North Carolina in 2015 or 2016. Mother stated that she had kicked friends out of their home and the friends "called on them" but that nothing had happened.

On March 9, 2019, Reese monitored a visit between the children, Parents, and the paternal grandmother. The social worker noted that Parents were engaging to all of the children and attentive to their needs.

On March 11, 2019, Mother was asked to take a drug test; she was noncompliant. Although Mother told Reese that she was not on the list to test that date, the social worker confirmed that Mother was on the list and they would be testing her. The following day, Mother said she went back to drug test but she was told to leave. The social worker contacted the facility and a staff member reported that Mother was asked to leave because she was "rude" to the staff. Mother told staff she was going to get water from her car and staff informed Mother that if she left the facility, she would be unable to take the drug test. Mother continued to be rude and walked out.

On March 19, 2019, CFS filed additional information with the court regarding the family's prior dependency case in North Carolina. In 2013, a case was opened in North Carolina "due to allegations of neglect noted, as the smell of marijuana, trash, clothes, old food, dog urine, dog feces, and vomit were reported. Also reported were concerns regarding the mother's mental health due to a previous incident of her trying to kill herself. [¶] North Carolina also reported in 2015 the mother became physical with an officer and was charged with simple assault due to hitting the law enforcement officer with a lamp." At that time, law enforcement had been called because Parents' neighbor

had reported screaming coming from Parents' home. Mother was intoxicated when law enforcement arrived. In April 2016 a case was opened when G.I. and J.C. were left alone in the home after school, unsupervised, and Mother arrived two to three hours later. There was documentation between 2015 and 2016 evidencing the prior social worker's attempts to contact Mother and Mother not returning phone calls, and numerous attempts to make unannounced house visits that were unsuccessful because no one would be home, or Mother would not allow the social worker into the home.

CFS recommended "family reunification services for both parents having significant involvement with child protective services due to neglect of the children in North Carolina and both parents having knowledge of the mother's mental health conditions which impaires [*sic*] her ability to keep the children safe. Throughout the documentation received from North Carolina, there are instances of substance abuse and domestic violence from both parents."

On April 4, 2019, CFS submitted additional information to the court. Reese reported that a child and family team meeting was held with Parents and paternal grandmother. "The meeting was held to see which recommendation the family wanted to choose moving forward in regard to family maintenance with the father and family reunification with the mother versus the current recommendations of family reunification with both parents." Parents stated that if Mother moved out of the home, it would be a financial burden "and that is not possible at this time." Parents also noted that the paternal grandmother could not " 'stay forever' " Moreover, the paternal grandmother indicated "that her time is 'limited' in California, but does not have a specific time frame

as to when she will return back to the state of New York." Parents stated "that they will continue to participate in family reunification services."

At the April 8, 2019, jurisdiction/disposition hearing, social worker Jonathean Reese testified. Reese testified that when he went to Parents' home on March 6, 2019, the condition of the home was acceptable. The children were initially removed based on the allegation of general neglect. However, during the course of the dependency, he learned about Parents' previous child protective services history in North Carolina, which became a concern. He noted that Mother had a voluntary family maintenance case and she failed to complete services. Father completed parenting classes and then was deployed. Reese was also concerned about Mother using marijuana in the home.

Reese also testified regarding the physical condition of the home. He stated that there were safety concerns regarding the condition of the home and Mother's inconsistencies in completing her services: "Safety concerns as far as the environment. Safety concerns as far as the inconsistencies as far as services for the mom." Additionally, Reese expressed concern that the family's current issues were similar to those in North Carolina in 2013.

Reese further testified that he had no information regarding the children's attendance at school. Also, when he observed visits between the children and Parents, there were no concerns.

8

When asked about the risk to the children if they were returned to Parents' care, Reese responded that he could not predict the future. Based on the family's history with child protective services, however, Reese noted that the current involvement was for the same conduct as in North Carolina's case.

Reese testified that CFS was not recommending return of the children to Father because Mother was still in the home. If Mother were not in the home, CFS would have returned the children to Father provided that he had the support of paternal grandmother, because Father was in military service. Reese further testified that Mother had a history of violence; in 2015, she struck a police officer. Mother also had a history of being uncooperative with services based on her past case in North Carolina.

Mother testified that she had a history of depression and anxiety. She also acknowledged that she had no local family or friend support. She said the home was a "huge mess" and claimed that it was because she was depressed and not taking her medication. She admitted that the home was inappropriate for the children. Mother testified that her plan was to keep her house clean; it was easier with Father home. She had not smoked marijuana since February 23, 2019. She also received a referral to a psychiatrist and had an upcoming appointment. She had been arrested because of the condition of the home but believed that the charges would be dropped if she took parenting classes. Mother was willing to take classes, be cooperative with the social worker, and allow the social worker into the home to check up on the children if they were returned to her care.

At the conclusion of the hearing, the juvenile court found true the following: (1) Mother failed to provide adequate care and shelter for the children because the home was found to be filthy, creating a hazard due to dirty clothing, trash, feces and lack of provisions, which placed the children at substantial risk of serious physical harm; (2) Mother had an untreated substance abuse issue that prevented her from being able to adequately parent the children, and marijuana was within reach of the children; (3) Mother had been diagnosed with ADHD, anxiety, depression and other mental health issues, Mother had failed to take medication since it was stolen, and if her mental health issues were left untreated, she placed the children at risk of serious physical harm; (4) and Father failed to protect the children from Mother's behavior, and he knew or should have known the dangers to which they were exposed while under her care. The section 300, subdivision (g) allegation that Father was deployed and unable to make appropriate arrangements for the children was found not true.

With regard to the disposition, the court stated: "These are issues that keep reoccurring, and they have not been resolved. And simply cleaning up the home and getting involved in services doesn't alleviate the fact that this is the third time a social services agency has been involved with the family and the issues are still unresolved." The court ordered reunification services and noted it took into account that family maintenance was discussed with Parents if Mother moved out of the home. Parents indicated that Mother moving out of the home was not an option. The court also gave authority for unsupervised, overnight and weekend visits for both parents with return to Father if Mother was not in the home.

C.     NOTICES OF APPEALS

On April 12, 2019, Mother filed a notice of appeal and on April 24, 2019, Father filed a notice of appeal.  Both challenge the jurisdiction and disposition findings.

**DISCUSSION**

A.     SUBSTANTIAL EVIDENCE SUPPPORTS THE JUVENILE COURT'S ORDER REMOVING THE CHILDREN FROM PARENTS' CUSTODY

Father contends that "there was insufficient evidence to support the removal of the children from their parents' custody at the disposition hearing."  Mother joins in Father's contention.

1.     *STANDARD OF REVIEW*

When a minor has been adjudged a dependent child of the court on the ground that he or she is a person described by section 300, the court may limit the control to be exercised over the dependent child by the parent or guardian.  (§ 361, subd. (a).)  A dependent child may not be taken from the physical custody of his or her parents or guardians unless the juvenile court finds, by clear and convincing evidence, certain circumstances exist.  (§ 361, subd. (c).)  A finding that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor, is one of the circumstances that justifies removal.  (§ 361, subd. (c)(1).)

11

The court's dispositional findings are reviewed for substantial evidence. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105.) Under this standard, we determine whether there is any substantial evidence, contradicted or uncontradicted, which supports the conclusion of the trier of fact. (*In re Tracy Z.*(1987) 195 Cal.App.3d 107, 113.) All evidentiary conflicts are resolved in favor of the respondent, and where more than one inference can reasonably be deduced from the facts, we cannot substitute our own deductions for those of the trier of fact. (*In re John V.* (1991) 5 Cal.App.4th 1201, 1212.)

2. *THE JUVENILE COURT'S FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE*

Father contends that "[a]t the time of the disposition hearing, there was no evidence before the juvenile court which demonstrated the children were at substantial risk of serious physical harm if they remained in their parents' custody." (§ 361, subd. (c)(1).) Citing numerous cases, Father argues that there was insufficient evidence of substantial risk of harm to the children in Parents' custody because a messy home is insufficient in itself to show danger to a child; and there was no evidence that Mother's mental health made her derelict in her parental duties. We disagree with Father's assessment of the evidence.

In this case, we find that substantial evidence supports the trial court's removal order. First, Parents have a history of involvement with child protective services in North Carolina from November 2013 through 2017. In North Carolina, similar to this case, Parents faced allegations of neglect as a result of a filthy home, substance abuse concerns and Mother's mental health issues. At that time, Mother had a voluntary family

12

maintenance case that she did not complete. During Mother's testimony in the instant case, she even acknowledged that the condition of her home was not appropriate. In making its ruling, the juvenile court stated: "In isolation this case looks a lot different. With all of the history provided, 150 pages or so from the other state, it looks much different. There are issues that keep reoccurring, and they have not been resolved. And simply cleaning up the home and getting involved in services doesn't alleviate the fact that this is the third time a social services agency has been involved with the family and the issues are still unresolved. [¶] And so that is why I am going to order family reunification services for the family." Substantial evidence supports the juvenile court's finding.

Father also argues that "the juvenile court's findings were not supported as the juvenile court failed to make findings regarding the reasonable efforts to prevent or eliminate the need for removal" as required under section 361, subdivision (d). Mother joins in Father's argument. Again, we disagree with Parents.

In this case, Reese spoke with Parents about choosing a recommendation between family maintenance with Father along with family reunification with Mother, as opposed to family reunification for Father and Mother. Parents, however, made it clear that Mother moving out of the home was not an option. Therefore, while the social worker presented a viable option to prevent the removal of the children from the home, it was Parents that decided that Mother could not move out. The juvenile court stated: "The minors are detained and removed from the parents. Temporary care and placement is vested with CFS. [¶] Reunification services are ordered for the parents, and I am taking

13

into account the 6.7 regarding the CFT where family maintenance was discussed if Mom moved out of the house, but the parents indicated that was not an option."

Moreover, Father suggests that "there were numerous reasonable means available to prevent the removal of the children from their parents' custody." "The juvenile court could have ordered frequent unannounced visits to the home by CFS to ensure the home remained clean and appropriate. Although paternal grandmother stated she could not stay in the home indefinitely, she stated she would be present 'as long as she [was] needed for support.' [Citation.] The juvenile court could have ordered that the children remain in the home so long as paternal grandmother remained in the home. The juvenile court could have ordered additional wrap-around services to provide additional supervision and in-home support to the family." We agree with Father that the court could have done the things suggested by Father. However, under the substantial evidence standard of review, there is ample evidence to support the court's order removing the children. As noted above, Mother failed to complete family maintenance services in the prior 2013 case. Moreover, the record shows that Mother has a history of avoiding contact with social workers. Given Mother's history, there was substantial evidence to support the court's order removing the children.

In sum, based on the facts of this case—including Parents' involvement with child protective services in North Carolina—we find that substantial evidence supports the court's order removing the children from parental custody.

14

## DISPOSITION

The juvenile court's orders and findings are affirmed.

CERTIFIED FOR PUBLICATION

MILLER_____

                                                                    J.


I concur:


RAMIREZ_____

                              P. J.

15

[*In re G.C. et al.*, E072514]

RAMIREZ, P.J., Concurring

I agree fully with the reasoning and the conclusion of Justice Miller in this matter. Our colleague, in his dissent, however, contends that this court has done an injustice to the family. I write separately to respectfully point out how the views of the dissent are based on a misunderstanding of the record facts of this case and the need to respect the appellate process. When this case is viewed from the appropriate appellate perspective, in conformity with the appropriate standards of review, the conclusion drawn by the majority on this record, the law, and our appellate role, affirmance is the only just conclusion.

Our colleague, in writing his dissent begins by maintaining this case highlights the "fundamental conceptual distinction" between the "assessment of risk" at the jurisdiction hearing and the "assessment of risk" at the dispositional hearing. This view reflects a fundamental misunderstanding of the function of the juvenile court, which does not "assess risk" at either hearing; rather, it makes findings and orders based on the assessments of risk that are performed by San Bernardino County Children and Family Services (CFS), the independent investigative arm of the court. (*In re Malinda S.* (1990) 51 Cal.3d 368, 377, fn. 8.) This fundamental misunderstanding is then compounded by our colleague's speculating as to the risk of recurrence, rather than following the well-established standards of appellate review. This puts our colleague on a path towards the substitution his own judgment for that of the of the trial court.

1

Our colleague begins by stating, "At jurisdiction, the court's task is to determine whether, *in the absence of court intervention*, the children would be at substantial risk of serious physical harm. But once the court takes jurisdiction and moves on to consider removal at disposition, the court's task is to determine whether, *given that the children will be under court supervision*, the children can be safely maintained in the custody of one or both parents." (Diss. opn., p. 1, original italics.) There is no citation of authority for this view, and none of the statutes which inform the juvenile court's duties, or the cases interpreting those statutes, describe such tasks.

To the contrary, and bottomed on years of well settled law, it is the function of CFS (not the trial court), to assess risk. It is CFS that investigates reports of abuse or neglect, determines whether there are grounds for a petition and whether the children need to be detained out-of-home (Welf. & Inst. Code, §§ 280, 281, 281.5)[1], determines whether child welfare services should be offered and whether a petition should be filed (§ 328), reports to the court the reasons for detaining a child away from the parent's physical custody (§ 319, subd. (a)), and prepares and files with the court written reports and written recommendations, including a social study of the minor, for consideration by the court (§§ 280, 281). Thus, by the initial detention hearing, intervention has already occurred.

In other words, at the jurisdiction hearing, the court does not determine whether intervention is required. Instead, at the jurisdictional hearing, the juvenile court is

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

2

specifically "tasked" with ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the child (§ 350), relying on the social studies prepared by the social worker, which constitute competent evidence upon which jurisdiction may be based. (§ 355, subds. (a), (b); *In re Malinda S., supra,* 51 Cal.3d at pp. 372, 379-380.)

That is, the juvenile court, after receiving evidence and hearing testimony, makes findings whether the child is at substantial risk of serious of serious physical harm or illness based on whether the child falls within one of the statutory definitions of a dependent child found in section 300. (Cal.Rules of Ct., rule 5.684(e).) This is a fact-finding function, based on CFS's assessment of risk and other evidence presented at the hearing.

Here, the trial court made true findings on the petition — and those findings are not challenged in this appeal — which leaves us with factual findings that mother failed to provide adequate care and shelter for the children by virtue of the unhygienic conditions allowed to exist; mother had an untreated substance abuse issue; mother had mental health issues, which, if left untreated, placed the children at risk of serious physical harm; and father failed to protect the children from mother's behavior.

Furthermore, these true findings properly include consideration of the fact that this is the third time this family has come to the attention of child welfare agencies based on nearly identical concerns: mother's mental health, unresolved substance abuse, and a house littered with animal feces and other unhygienic conditions. Note that evidence of past conduct may be probative of current conditions (*In re Kristin H.* (1996) 46

3

Cal.App.4th 1635, 1650), so the past child welfare history, which included a voluntary services plan agreed to - but not completed - by mother in North Carolina, was properly considered in determining whether a current incident warranted jurisdiction over the family.[2] After all, the trial court cannot make a jurisdictional finding based on a one-time situation that is unlikely to reoccur. (See *In re J.N.* (2010) 181 Cal.App.4th 1010, 1023, citing *In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1396 [section 300 "effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]"].) It is for that reason that child welfare history of a family was properly taken into account by the juvenile court.

Once true findings are made on the allegations of the petition, as in this case, they are prima facie evidence that the child cannot safely remain in the home. (§ 361, subd. (c)(1).) Neither parent challenges the jurisdictional findings made in this case, and it is not our function to second guess an unchallenged finding, where the trial court had before it the parent's past conduct as well as present circumstances in considering the disposition. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917, citing *In re S. O*. (2002) 103 Cal.App.4th 453, 461.)

It is a fundamental tenet of appellate review that we are not authorized to substitute our judgment for that of the trial court: Challenges to the resolution of disputed factual questions are governed by the substantial evidence standard of review,

---

[2] In this respect, our colleague's criticism of the inclusion of the North Carolina proceedings in the calculus of substantial risk is mistaken.

however, and that standard does not permit a reviewing court to "substitute its judgment for that of the juvenile court." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 584.)  We do not "reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court." (*Id.* at p. 589.)  We are bound by principles of stare decisis (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and numerous decisions, including those of our Supreme Court, which have stated with clarity our well-defined role.  (See *In re I.J.* (2013) 56 Cal.4th 766, 773, quoting *In re Heather A*. (1996) 52 Cal.App.4th 183, 193; see also, *In re Angelia P.* (1981) 28 Cal.3d 908, 924; *In re Matthew S*. (1988) 201 Cal. App. 3d 315, 321.)

Instead, we must """"accept [] the evidence most favorable to the order as true and discard [] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact."" [Citation.]" (*In re Aurora P*. (2015) 241 Cal.App.4th 1142, 1167.)  We review a removal order for substantial evidence.  (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

Our colleague ignores these basic and fundamental concepts and maintains that there is there is no evidence mother's presence in the home would create a substantial danger to the children.  (Diss. opn., p. 3.)  Such a conclusion is contrary to the record evidence showing mother had a long history of mental illness, and that the family experienced repeated interventions based on the same or similar child welfare concerns.  Only by ignoring the family history and the record on appeal, as well as the limitations on our role on appeal, can a contrary assertion be made.

In our colleague's dissent, he arrives at the conclusion that return of the children was compelled because the situation had been ameliorated prior to the disposition hearing

(diss. opn., p. 2), but this conclusion also ignores the evidence: that it was the grandmother who cleaned up the house after CFS intervened, and, in each of the prior child welfare interventions, a very similar pattern was followed by mother, only to end up with mother "backsliding" again. To urge return of the children to the parental home because "there is no evidence that those risks were likely to recur overnight and without warning," (diss. opn., p. 3) is unsupported by the record, while simultaneously ignoring the governing standards of review.

It is a fundamental rule of appellate review: "that a judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance. [Citations.]" (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 765-766.) The dissent's view that mother's conduct is not likely to recur "overnight" is an exercise in speculation, and inconsistent with the limitations on our review, not to mention the welfare of the children.

Our colleague further maintains that the record contains no evidence that there were no reasonable means to protect the children without removal. (Diss. opn., p. 4.) Yet, the dissent acknowledges that the requisite statutory findings were made.[3] (Diss. opn., pp. 1-2.) Contrary to the dissent's views, the necessary findings of substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if the minor were returned home *do not require* that the parent be found to be

---

[3] The fact that the juvenile court may not have orally made the specific findings is of little moment where the court had admitted the reports into evidence, adopted the recommendations of the social worker's report, and made its ruling based on the evidence presented. This is a practice commonly employed by the juvenile courts.

dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. (*In re I.J., supra,* 56 Cal.4th at p. 773; *In re A.E.* (2014) 228 Cal.App.4th 820, 825-826, citing *Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) Consequently, our colleague's focus on this not being a case in which a parent physically, sexually or emotionally abused the children (diss. opn., p. 3) ignores that basic rule. (*In re I.J., supra,* at p. 773.)

Our colleague then argues that CFS's position "amounts to a concession that there was no substantial danger to the children at home in father's custody, as long as mother was not there." (Diss.opn. p. 3.) However, what is overlooked is the substantial risk to the children's safety *with* mother present, and the fact the parents were financially unable to have mother move out. To answer the rhetorical question of what danger there would be in returning the children to the parents' home, posed by the dissent: mother would be in the home, she has a history of non-compliance with child welfare agencies and a long history of mental illness that brought the children to the attention of the juvenile court. It also bears mentioning that the dissent's reference to the grandmother's willingness to remain with the family "for as long as she is needed" is contradicted by the record showing that grandmother's time in California was limited, and she could not stay indefinitely. (Typed. Opn., p. 7.)

The majority opinion, deferring to the record, correctly concludes that the removal was supported by substantial evidence, grounding that conclusion on the record facts viewed through the lens of proper appellate review. Removal was justified. On appeal, it

7

is neither our role nor our function to substitute our judgment for that of the trial court unless - unlike the present case - there is insufficient evidence to support the findings made by the court. The record here demonstrates substantial evidence to support the judgment, because the parents failed to meet their appellate burden, notwithstanding the views maintained in the dissent. It is not our job to gamble on the children's welfare by assuming, without citation to authority or evidence in the record, that the risks were not likely to recur overnight. The views of the majority are based on the record facts and settled law.

The views expressed by our colleague are based on speculation, and the only potential for injustice in this case is that which would inure to the children, whose welfare would be threatened if the views of the dissent influenced our opinion.


RAMIREZ             
P. J.

8

[*In re G.C. et al*., E072514]

MENETREZ, J., Dissenting.

The juvenile court did an injustice to this family by removing these children from

parental custody.  The majority compounds that injustice by affirming the court's

decision despite the lack of evidence to support it.  I therefore respectfully dissent.  In

Part I, I explain why the record does not support the trial court's findings.  In Part II, I

discuss a common legal error that is repeated in the concurrence, which has important

consequences for appellate review in dependency cases.

I.

This case highlights the fundamental conceptual distinction between (1) the

assessment of risk at the jurisdiction hearing on a petition under subdivision (b)(1) of

Welfare and Institutions Code section 300,[1] and (2) the assessment of risk when the court

is considering removal from parental custody at the disposition hearing.  At jurisdiction,

the court's task is to determine whether, *in the absence of court intervention*, the children

would be at substantial risk of serious physical harm.  (See, e.g., *In re Rocco M.* (1991) 1

Cal.App.4th 814, 824 [at jurisdiction, the court determines "whether circumstances *at the*

*time of the hearing* subject the minor to the defined risk of harm"].)  But once the court

takes jurisdiction and moves on to consider removal at disposition, the court's task is to

---

[1]     Subsequent statutory references are to the Welfare and Institutions Code.

1

determine whether, *given that the court has taken jurisdiction*, the children can be safely maintained in the custody of one or both parents.[2]

No parent challenges jurisdiction in this case, and rightly so. The parents argue only that there was no basis to remove the children from parental custody. I agree.

To order the children removed from their parents' physical custody, the trial court had to find by clear and convincing evidence that there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the children in the parents' home, and "there are no reasonable means by which the [children's] physical health can be protected without" removal. (§ 361, subd. (c)(1).) The trial court's minute order contains all of those required findings (though the court made no such findings orally), and we review them under the substantial evidence

---

[2] It is not clear what point the concurrence is trying to make by claiming that San Bernardino County Children and Family Services (CFS), rather than the court, assesses risk, and that the court makes factual findings based on CFS's assessments of risk. (Conc. opn., *ante*, at p. 1 [the court "makes findings and orders based on the assessments of risk that are performed by" CFS]; *id.* at p. 2 ["it is the function of CFS (not the trial court), to assess risk"].) At jurisdiction, the court makes factual findings concerning the kind and degree of risk faced by the children at that time. (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.) At disposition, the court again makes factual findings concerning the danger to the children and whether there are reasonable means to protect the children without removal from parental custody. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) In making those factual findings, the court assesses the risks to the children, on any reasonable understanding of the terms "assess" and "risk." And the court makes its factual findings on the basis of all of the evidence introduced by the parties, not solely on the basis of CFS's risk assessments. (See § 355, subd. (a) [at jurisdiction, "[a]ny legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence"]; § 358, subd. (b) [at disposition, the court "shall receive in evidence" such "other relevant and material evidence as may be offered"].)

standard.  (*In re Heather A., supra*, 52 Cal.App.4th at p. 193.)  The problem is that the record contains no evidence to support them.

This case began with a referral alleging that the home was filthy and unsanitary and smelled of marijuana, and that there were feces and urine on the floors, expired food in the refrigerator, moldy food in the cabinets, and no formula for the baby.  Mother was taken into custody and made "suicidal disclosures."  When interviewed, she said that she had been off her psychotropic medications because they were stolen and she had to wait three months before her insurer would authorize refills.  Father is an active duty member of the United States Marine Corps and was deployed in Syria at the time.

By the time of the jurisdiction and disposition hearings, all of the immediate risks had been addressed.  Mother was back on her medications and felt better.  Father was home.  The paternal grandmother was also staying with the family and stated that she would remain "as long as she is needed for support," though she and the parents acknowledged that she could not stay "forever."  The home was clean, met community standards, and was stocked with appropriate food, including for the baby.  The family no longer had any pets (who were the sources of the urine and feces on the floors), having gotten rid of them the day the children were detained.  The social worker testified that the parents requested parenting classes and counseling and, as of the date of the jurisdiction and disposition hearings, had "been cooperative."

Mother also admitted that she had been using marijuana to self-medicate and that she might test positive for it.  She agreed to comply with on-demand drug testing, failed

to comply with tests on March 11 and 12, 2019, but then did test on March 15. It appears the test was positive for marijuana, as mother had predicted.

Given those facts, there was no showing of a substantial danger to the children in the parents' home. Every single safety risk identified at the time of the referral was gone. There was, of course, the risk of backsliding by the parents. But because the court had taken jurisdiction, the children were going to be under the supervision of both the court and CFS going forward. In addition, the grandmother would be there "as long as she is needed." All told, the evidence discloses no danger—let alone a substantial danger—to the children in the parents' physical custody at the time of disposition.

To a significant extent, CFS actually concedes the point, because the social worker testified that there were "no concerns" with father and that CFS was willing to recommend that the children be returned to father if mother moved out. The parents had informed CFS that mother could not move out, for financial reasons, and CFS consequently recommended removal from both parents. CFS's position amounts to a concession that there was no substantial danger to the children at home in father's custody, as long as mother was not there.

So the question becomes: What substantial danger to the children would mother's mere presence in the home create? The answer on this record is: None. This is not a case in which a parent was physically, sexually, or emotionally abusing the children, which might put the children at risk of harm any time they were left alone in the parent's care. Rather, the risks here related entirely to the deterioration of the home environment as a result of mother's apparent decompensation when off her psychotropic medications.

4

There is no evidence that those risks were likely to recur overnight and without warning. Father and paternal grandmother were in the home, and the entire family was under the watchful eyes of the court and CFS. If the situation began to deteriorate, CFS could help the parents take steps to stop the decline and keep the children safe. And if such steps proved ineffective, CFS could file a supplemental petition. But the record contains no evidence of a substantial danger to the children at the time of disposition if returned to the physical custody of both parents.

For similar reasons, the record contains no evidence that there were no reasonable means to protect the children without removal. The court could have placed the children with the parents on condition that (1) the paternal grandmother remain in the home, (2) the mother continue to comply with her mental health treatment, (3) both parents comply with their case plans, and/or (4) both parents comply with frequent (perhaps weekly), unannounced home visits. The court could also have ordered additional in-home support services, such as Wraparound or Family Preservation, in order to make sure there were additional eyes on both the children and the home on a regular basis. The record contains no evidence that such measures would have been inadequate to see to the children's safety.

Evidence of the parents' child welfare history is relevant, but it too is insufficient to support the trial court's findings. The family previously lived in North Carolina and had some contacts with child protective services there. The majority asserts that "[i]n 2013, a case was opened in North Carolina" based on allegations similar to those in the February 2019 referral (dog feces, urine, and vomit in the home, the smell of marijuana,

5

and an alleged prior suicide attempt by mother).  (Maj. opn., *ante*, at p. 6.)  What the majority neglects to mention is that the 2013 "case" was merely a referral, which North Carolina child protective services investigated and closed as "Unsubstantiated," with services "Not Recommended."  (Boldface omitted.)  The record contains no evidence of a prior suicide attempt.

On the basis of that history, the majority faults mother for having "failed to complete family maintenance services in the prior 2013 case."  (Maj. opn., *ante*, at p. 14.)  But there were no services and no court case at all in 2013.  There was just an unsubstantiated referral, with no services recommended.

The majority also describes an incident in 2015 in which mother was charged with assault for hitting a law enforcement officer with a lamp, and the majority asserts that another "case was opened" in 2016 when the children were left alone at home.  (Maj. opn., *ante*, at pp. 6-7.)  The documents from North Carolina present the following picture:  In 2015, the family was living on the military base where father was stationed.  A loud verbal altercation between the parents led a neighbor to call the police, who responded to the home.  The home was not messy.  Mother appeared to be intoxicated and registered .09 blood-alcohol content according to a breathalyzer; father admitted drinking beer but did not appear intoxicated and was not tested.  The cause of the altercation was a series of text messages that mother had seen on father's phone, which made her think he was cheating on her; father claimed that mother had misinterpreted the texts, and it was all a misunderstanding.  When one of the police officers tried to remove mother from the home, she picked up a lamp and hit him with it.  Child protective

6

services opened a voluntary family maintenance case, meaning that the social workers would provide services and work with the family without court involvement.

The record does not contain the case plan for either parent. The case notes, however, appear to reflect that father completed his entire case plan except for a mental health assessment, which he hoped to complete while deployed overseas in Japan. The record contains no evidence that father has ever had any mental health problems. Father asked the North Carolina social worker why the case was remaining open when he had completed almost everything, and the social worker told him that because "there was DV [i.e., domestic violence] involved that both people would need to complet[e] the case plan." Mother claimed the altercation with the police was a one-time incident, and she expressed frustration that the parents had to do anything; it appears she did not participate in programs. Notwithstanding the North Carolina social worker's statement that it was a domestic violence case, the record contains no evidence that there has ever been any violence between the parents, or any violence in the home apart from the single incident with the police and the lamp.

While that voluntary case was ongoing, an additional referral was received, alleging that one day there was no adult at home when the children got home from school. Child protective services apparently addressed that issue within the context of the existing voluntary case. Eventually father was transferred to Twentynine Palms, California, and the family moved with him. The North Carolina social workers closed their case after confirming that the children were in school in Twentynine Palms.

That is the parents' child welfare history. To be sure, it reveals that mother and father are not pure as the driven snow. They have one unsubstantiated referral and one voluntary family maintenance case, based on an alcohol-fueled verbal altercation over alleged infidelity in which mother struck a police officer who was trying to remove her from her home, plus an additional referral during that case because on one occasion no parent was home when the children got home from school. Father complied with services in the voluntary case, mother did not, and the case closed when father was transferred to California.

But it takes more than an imperfect record to justify removal from parental custody. Even when the evidence of the parents' child welfare history in North Carolina is added to the evidence developed in the instant case, along with all reasonable inferences therefrom, it does not constitute substantial evidence that the children would be in danger in the parents' custody *under court supervision* or that there are no reasonable means to protect them without removal.

The juvenile court's visitation order is also worth noting. Although the court ordered the children removed from both parents, it also ordered unmonitored overnight and weekend visits *for both parents*. Although such a disposition—removal coupled with unmonitored overnight and weekend visitation—may be valid in some cases, here the visitation order is tantamount to a concession that there was no basis for removal. Again, the only risks to the children were the potential for deterioration of either the home environment or mother's mental health. The visitation order makes sense in light of the lack of any evidence that either risk was likely to manifest suddenly or without

8

warning—the court recognized that the children would be safe with both parents unmonitored for entire weekends.  On these facts, it follows that the children would be safe in the parents' care under the ongoing supervision of the court and CFS.

II.

I do not believe that the concurring opinion contains either meaningful criticism of this dissent or meaningful support for the majority opinion.  It does, however, contain a significant legal error.

The concurring opinion asserts that the jurisdictional findings "are prima facie evidence that the child cannot safely remain in the home," citing section 361, subdivision (c)(1).  (Conc. opn., *ante*, at p. 4.)  That is incorrect as a matter of law.  The cited statutory provision does not state that jurisdictional findings constitute prima facie evidence for removal *in general*.  Rather, it states that jurisdictional findings constitute prima facie evidence for removal *if jurisdiction was based on severe physical abuse of a child under age five*.  (§ 361, subd. (c)(1) ["[t]he fact that a minor has been adjudicated a dependent child of the court *pursuant to subdivision (e) of Section 300* shall constitute prima facie evidence that the minor cannot be safely left [in the home]" (italics added)]; § 300, subd. (e) [providing for dependency jurisdiction in cases of "severe physical abuse" of a child "under the age of five years"].)  By singling out cases under subdivision (e) of section 300 for special treatment, the statute implies that other cases should not be so treated.  (*In re Bryce C.* (1995) 12 Cal.4th 226, 231 ["Generally, the expression of some things in a statute implies the exclusion of others not expressed"].)  Thus, in cases like this one, in which jurisdiction was taken under subdivision (b) of section 300, the

9

jurisdictional findings do not constitute prima facie evidence that the children cannot safely remain in the home.  The concurrence consequently is wrong as a matter of law.

The concurrence is also wrong as a matter of more general principles of dependency law, for the following reasons:  At jurisdiction the court does not make any findings concerning the availability of reasonable means to protect the children without removal, but such findings are required for removal at disposition under section 361, subdivision (c)(1).  The statute's special treatment of cases involving severe physical abuse of children under age five reflects a legislative judgment that *in those cases* such means are presumptively unavailable (though even there the presumption can be rebutted; the jurisdictional findings are only prima facie evidence).  But the Legislature has expressed no such judgment about other cases.  Moreover, jurisdictional findings cannot generally constitute prima facie evidence supporting removal because of the fundamental conceptual distinction I described at the start of Part I:  When the court makes its jurisdictional findings, it is evaluating the risk to which the children would be subjected *in the absence of court intervention*.**3**  But when the court makes removal findings and

---

**3**      Suppose, for example, the petition alleges that one parent's abuse of methamphetamine puts the child at substantial risk of serious physical harm and that the other parent fails to protect the child from the first parent's drug abuse.  At the detention hearing, the court detains the child from the drug-abusing parent but releases the child to the other parent, with a monitored visitation order for the drug-abusing parent.  If the parents comply with all of the court's orders, then the child will not be at risk at the time of the jurisdiction hearing—the court's detention and visitation orders will have made the child safe.  But the absence of actual risk at the time of the jurisdiction hearing obviously does not require that the petition be dismissed, even though the court's jurisdictional findings must be based on the circumstances existing at the time of the hearing.  (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.)  Rather, the court may sustain the petition if

10

orders at disposition, the court has already taken jurisdiction, so the court's inquiry is different—now that the court has taken jurisdiction, can the children be safely maintained in the custody of one or both parents?  Given that conceptual distinction, there cannot be a general rule that jurisdictional findings constitute prima facie evidence for removal.

I have found nine published cases, including one cited by the concurrence, that make the same mistake as the concurrence by asserting that jurisdictional findings are, in general, prima facie evidence that the children cannot safely remain in the home.  (*In re D.B.* (2018) 26 Cal.App.5th 320, 332; *In re A.F.* (2016) 3 Cal.App.5th 283, 292; *In re J.S.* (2014) 228 Cal.App.4th 1483, 1492; *In re A.E.* (2014) 228 Cal.App.4th 820, 825; *In re T.V.* (2013) 217 Cal.App.4th 126, 135; *In re John M.* (2012) 212 Cal.App.4th 1117, 1126; *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146; *In re R.V.* (2012) 208 Cal.App.4th 837, 849; *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)  Not one of those cases contains any discussion or analysis in support of that proposition.  In each case, the only authority cited is either subdivision (c)(1) of section 361 or another case based on it.  In addition, my research indicates that the unpublished cases perpetuating and relying upon this legal error number in the hundreds.  Mere repetition does not, however, convert falsehood into truth.

This legal error has severe consequences for appellate review of removal from parental custody in dependency cases.  The juvenile court's removal findings and orders must be affirmed if they are supported by substantial evidence, contradicted or

---

the evidence supports a finding that the child *would be* at substantial risk of physical harm *but for the court's intervention*.

uncontradicted. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) If jurisdictional findings always constitute prima facie evidence that the children cannot safely remain in the home, then whenever there is substantial evidence to support the jurisdictional findings, the removal findings and orders must be affirmed as well. In effect, the error deprives parents of appellate review of removal if there was a sufficient evidentiary basis for jurisdiction.

The children in this case were not adjudicated dependents under subdivision (e) of section 300. The petition contains no allegations under that provision, and the record contains no evidence that any of the children (including the one under age five) have suffered any physical abuse, let alone severe physical abuse. The jurisdictional findings accordingly do not constitute prima facie evidence that the children cannot safely remain in the home. There is no substitute for analysis of the evidence of the actual risk faced by the children and the availability of reasonable means to protect them without removal.

For all of the foregoing reasons, I respectfully dissent. Because the removal findings are not supported by substantial evidence, I would reverse the removal orders and direct the juvenile court to return the children to the custody of both parents.

MENETREZ        
J.